IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VISHNAMPET JAYANTHINATHAN and ENGINEERING SYSTEMS SOLUTIONS, <br><br>Plaintiffs, <br><br>v. <br><br>SALLY PESIRI and ALL TECHNOLOGIES, INC. <br><br>Defendants. | ) ) ) ) ) ) ) Civil Action No.: 1:07-cv-977 ) ) ) ) ) |

## MEMORANDUM OPINION

Before the Court are Defendants' Motion to Set Aside Jury Verdict and for Entry of Judgment In Favor of Defendants (Dkt. No. 65), and Plaintiffs' Opposition and Cross Motion To Set Aside Jury Verdict and for Entry of Judgment In Favor of Plaintiffs (Dkt. No. 69). For the reasons set forth below, as well as those given in open court, the Court denies Defendants' Motion in its entirety and grants Plaintiffs' cross-motion to set aside the $47,000 award against Vishnampet Jayanthinathan (Mr. Nathan).

### I.   Background.

This case arose from a fallout over a cooperative business venture between two companies and their respective owners: Plaintiff Mr. Nathan, owner of Plaintiff Engineering Systems Solutions, Inc. (ESS), and Defendant Sally Pesiri, the former owner of All Technologies, Inc. (AllTech). In late 2004 Ms. Pesiri was the CEO and sole shareholder of AllTech. Mr. Nathan was the CEO and sole shareholder of ESS, a small business engaged in the business of providing computer systems integration and professional services. In October 2004,

AllTech was facing financial difficulties and Ms. Pesiri approached Mr. Nathan for financial and operational assistance. During the course of these negotiations, Ms. Pesiri represented to Mr. Nathan that AllTech could obtain lucrative government contracts. She offered him a stock ownership interest in AllTech in exchange for financial and management assistance running the company. These discussions culminated in a written agreement called the "Sale of Shares and Shareholder Agreement" (the "Shareholder Agreement"), which Ms. Pesiri and Mr. Nathan entered into on January 26, 2005. Under the Shareholder Agreement, Mr. Nathan agreed to purchase 40 percent of AllTech stock from Ms. Pesiri in exchange for a $100,000 line of credit. Mr. Nathan also agreed to provide management and accounting services and to serve as CEO of AllTech for a period of two years. Ms. Pesiri and Mr. Nathan also executed an "Amendment to the Shareholder Agreement," on January 26, 2005, which further specified the terms including a right of termination for non-compliance.

The parties executed two additional agreements. On August 16, 2005, AllTech and Pesiri entered into the Ownership Interest Purchase Agreement (the "Purchase Agreement") with Mr. Nathan. This agreement incorporated terms from the Shareholder Agreement and specified that AllTech agreed to sell Mr. Nathan a 40 percent interest in AllTech through 10,000 shares of stock in exchange for a $100,000 line of credit. On July 25, 2006, the two companies, ESS and AllTech, entered into the Subcontracted Services Agreement (the "Services Agreement"). Under the terms of the Services Agreement, ESS agreed to provide AllTech with various management services as specified in paragraph 4 of the Shareholder Agreement.

In their complaint, Mr. Nathan and ESS alleged that they provided management services to Ms. Pesiri and AllTech for several years, as well as multiple lines of credit totaling $458,000. They further alleged that Ms. Pesiri and AllTech have refused to repay the line of credit, failed to

assign the stock to Mr. Nathan, and failed to generate any subcontractor opportunities for ESS. On September 27, 2007, Mr. Nathan and ESS filed suit in this Court, alleging breach of contract, fraudulent misrepresentation, and unjust enrichment against Ms. Pesiri and AllTech. On Defendants' motion, the Court dismissed the fraudulent misrepresentation count for failure to plead with sufficient particularity under Federal Rule of Civil Procedure 9(b). On March 5, 2008, Defendants Pesiri and AllTech asserted two counterclaims for breach of contract against Mr. Nathan, one for breach of the Sale Agreement and one for breach of the Purchase Agreement, and a counterclaim against ESS for breach of the Services Agreement.

The Court held trial from March 10 to March 17, 2009. The jury returned its verdict on March 17. As to the claims brought by Plaintiffs Mr. Nathan and ESS, the jury found as follows:

(1) For Mr. Nathan and ESS on their claim for breach of contract against Defendant Pesiri, with a damages award of "40% of AllTech shares and corresponding profits" and "an accounting to determine any profits";

(2) For Mr. Nathan and ESS on their claim for breach of contract against Defendant AllTech, with a damages award of $325,000 and 40percent of AllTech shares and corresponding profits and an accounting;

(3) For Mr. Nathan and ESS on their claim for unjust enrichment against Ms. Pesiri and AllTech, with a damages award of 40percent of AllTech shares and corresponding profits.

As to the counterclaims brought by Ms. Pesiri and AllTech, the jury found as follows:

(1) For Ms. Pesiri and AllTech on their claim for breach of contract against Mr. Nathan regarding the Shareholder Agreement, with a damages award of $47,000;

(2) Against Ms. Pesiri and AllTech on their counterclaim against Mr. Nathan for breach

of contract regarding the Purchase Agreement;

(3) Against Ms. Pesiri and AllTech on their counterclaim against ESS for breach of contract;

(4) Against Ms. Pesiri and AllTech on their counterclaim against Mr. Nathan and ESS for unjust enrichment;

(5) For Ms. Pesiri and AllTech on their counterclaim against Mr. Nathan for breach of fiduciary duty, with a damages award of zero.

After trial the parties each filed cross-motions for judgment as a matter of law under Federal Rule of Civil Procedure 50. The Court held a hearing on these motions on April 24, 2009. At that hearing, the Court found that the jury had a reasonable basis to award Plaintiffs a 40 percent ownership in AllTech and all corresponding profits, and that an accounting was necessary to determine the amount, if any, of lost profits. The Court ordered an accounting to be completed within sixty (60) days and took under advisement the matter of the $47,000 award on Defendants' counterclaim against Mr. Nathan. Having been fully briefed and argued, that issue is now ripe for decision.

## II.  Standard of Review.

A district court may grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *GSM Dealer Services, Inc. v. Chrysler Corp.*, 32 F.3d 139, 142 (4th Cir. 1994) (quoting Fed. R. Civ. P. 50(a)). If the court denies a party's motion for judgment as a matter of law during trial, the party may renew the motion after the trial. Fed. R. Civ. P. 50(b). Under Rule 50, the court must examine

the evidence in the light most favorable to the non-moving party and ascertain "whether a reasonable trier of fact could draw only one conclusion from the evidence." *GSM Dealer Services*, 32 F.3d at 142 (quoting *Townley v. Norfolk & W. Ry.*, 887 F.2d 498, 499 (4th Cir. 1989)).

### III. Discussion.

### A. Plaintiffs adduced adequate evidence at trial to support the jury's award of lost profits and an accounting.

Defendants argue that the jury's award of lost profits was not supported in law or by evidence at trial. This is incorrect. Plaintiffs brought a claim for breach of contract against Ms. Pesiri and AllTech. In general, a plaintiff is entitled to recover all non-speculative damages flowing from a breach of contract. *See* Williston on Contracts, § 66:74 (4th Ed. 2002) ("It is widely accepted, as a general rule, that profits lost by the buyer as the result of the seller's breach of the contract are recoverable as consequential damages."); *LaVay Corp. v. Dominion Federal Sav. & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir. 1987) ("Lost profits are, of course, generally available to a plaintiff as damages in the successful prosecution of a claim for a breach of contract") (citing Restatement (Second) of Contracts § 351 (1979)); *see also Universal Lite Distributors, Inc. v. Northwest Industries, Inc.*, 602 F.2d 1173 (4th Cir. 1979); *Gurney Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 467 F.2d 588 (4th Cir. 1972). In this case, ample evidence supported the jury's finding that Ms. Pesiri and AllTech breached the contract and that Mr. Nathan and ESS were entitled to a 40 percent share of AllTech's profits. In particular, the Shareholder Agreement between Mr. Nathan and Ms. Pesiri specified that $60,000 would be paid

to Ms. Pesiri "from the profit income of AllTech out of the buyers' [Mr. Nathan]'s 40% share of the profit." Further, the Purchase Agreement specified that Mr. Nathan shall have a 40 percent ownership interest in AllTech. This ownership interest entitled Mr. Nathan to a share of AllTech's profits. In the context of these agreements, which clearly intended to provide Mr. Nathan with a 40percent ownership interest in AllTech, it was reasonable for the jury to award "40% of AllTech shares and corresponding profits" as damages and to find that an accounting was necessary to determine whether any profits existed.

**B.    The $47,000 award for Defendants against Mr. Nathan was not supported by a legally sufficient evidentiary basis.**

Mr. Nathan brings a cross-motion to set aside the jury's $47,000 award against him in his personal capacity. In the alternative, he seeks an offset of this sum against the $325,000 that the jury awarded to Plaintiffs against AllTech. At trial, Defendants put on evidence that in July 2007, ESS wrongfully terminated the health insurance benefits of AllTech employees, that this caused employees to leave the company, and that as result AllTech lost a government contract worth $47,000. For the jury to reasonably award $47,000 against Mr. Nathan for breach of the Shareholder Agreement, it must have accepted the following suppositions: First, that Mr. Nathan had a personal obligation to provide AllTech workers with health insurance arising from the Shareholder Agreement; second, that the Shareholder Agreement had not expired before July 2007 when the health benefits of AllTech employees lapsed; third, that AllTech's employees left the company as a result of losing health benefits; fourth, that AllTech lost a government contract as a result of these employees leaving the company; and fifth, there was a reasonable certainty that losing this contract damaged AllTech and Ms. Pesiri in the amount of $47,000.

The Court must set aside the $47,000 award against Mr. Nathan. The evidence adduced at trial demonstrated that Mr. Nathan had no *personal* obligation to AllTech employees to provide health benefits. First, no specific terms of the Shareholder Agreement obligated Mr. Nathan to provide health insurance benefits to AllTech employees. The only explicit reference to health benefits in the Shareholder Agreement is contained in a single bullet point under paragraph 4, which simply states that "Sally G. Pesiri will receive the benefits of an acceptable health plan with dental benefits paid for by AllTech." Thus, although the parties expressly provided that Ms. Pesiri would have health benefits, they made no mention of health benefits for other employees.

Defendants admitted at oral argument that the Shareholder Agreement does not specifically say that Mr. Nathan "personally had an obligation to pay out of his own pocket." Defendants instead attempt to shoehorn a personal obligation into the general contractual language regarding Mr. Nathan's management obligations. Defendants argue – without citation to authority – that "overseeing the procurement and maintenance of employees health insurance is a fundamental management obligation." To be sure, the Shareholder Agreement contained general language about Mr. Nathan providing management and financial support to AllTech and assisting in the operation and well-being of the company.[1] Such boilerplate language, however, does not support a finding that Mr. Nathan made a personal guarantee that AllTech employees would have health benefits. The jury's verdict thus finds no support in the explicit language in

---

[1] Specifically, certain bullet points under paragraph 4 of the Shareholder Agreement provided that "Buyer [Mr. Nathan] will provide Management Support for the operations of AllTech," that "[Mr. Nathan] will provide Additional Financial Support as needed to support operational and contractual needs of AllTech using the line of credit," and that "[Mr. Nathan] will assist in any and all aspects concerning the operation and well-being of AllTech."

the Shareholder Agreement.

Moreover, any personal obligation under the Shareholder Agreement to provide health benefits to other AllTech employees had terminated prior to July 2007 because the agreement had expired. Mr. Nathan and Ms. Pesiri entered into the Shareholder Agreement on January 26, 2005. The agreement specified that Mr. Nathan would serve as CEO of AllTech for a period of two years. On January 29, 2007, AllTech's Chief Operating Officer Mr. Jurgens sent an email stating that "Sally and I would like to schedule a meeting with Mr. Nathan sometime next week to reconstitute the agreement between AllTech and Jay [Nathan]. *The original agreement expired Jan[uary] 26 and we are looking to renew it.*" (Emphasis added.) The "original agreement" referred to in this email must be Shareholder Agreement because it was the first contract between the parties. This email shows that Ms. Pesiri assumed the Shareholder Agreement had expired, as she wanted to schedule a meeting with Mr. Nathan to discuss renewing it.[2]

Other evidence at trial showed that, in the months after January 2007, the parties were negotiating in an unsuccessful effort to reconstitute the agreement. For example, an email from Mr. Jurgens to Mr. Nathan on March 15, 2007 stated that "Sally had sent you a draft of a new agreement and we would be negotiating that as soon as you [Mr. Nathan] came back [from India]," and that "Sally preferred to send a draft [of the new agreement] to you." Mr. Jurgens

---

[2] Even if the Shareholder Agreement did not expire by its own terms when Mr. Nathan reached his two-year mark as CEO of AllTech, he retained the right to terminate the agreement at any time for non-compliance. The Amendment to the Shareholder Agreement, also executed on January 26, 2005, provided that "[i]f for any reason, the terms and conditions of this agreement are not complied with by either party, then the non-offending party has the right to terminate this agreement with prejudice."

testified at trial that the parties never renewed the agreement. In accord with this testimony, the record contains an unsigned draft agreement – with handwritten markups – dated April 2007. This course of dealing between the parties further corroborates Jurgens' January 29 email and demonstrates that both parties assumed the original Shareholder Agreement had expired before the health insurance lapsed in July 2007. Thus, any personal obligation on the part of Mr. Nathan to provide health benefits to AllTech employees was extinguished before any employees left the company over lost health benefits.[3]

Defendants further argue that Mr. Nathan was obligated to provide health benefits to AllTech employees by virtue of the Services Agreement executed on July 25, 2006. But Mr. Nathan was not a party to the Services Agreement. In fact, this agreement was entered into "by and between Engineering Systems Solutions, Inc. (ESS) and All Technologies, Inc. (ALLTECH)." Nor did the Services Agreement contain language that arguably could create a personal obligation on the part of Mr. Nathan. Any obligations under the Services Agreement were incumbent upon the company ESS – not Mr. Nathan. Perhaps in tacit recognition of this fact, Ms. Pesiri and AllTech did not assert a counterclaim against Mr. Nathan for breach of the Services Agreement. A party cannot recover at trial on a claim it has not made.

Accordingly, the Court holds that there was no "legally sufficient evidentiary basis" for

---

[3] The parties executed the Services Agreement on July 25, 2006, about a year and a half after the original Shareholder Agreement. Under the Services Agreement, the company ESS assumed the management and financial support obligations identified in paragraph 4 of the original Shareholder Agreement. Thus, by executing the Services Agreement, ESS the company adopted the financial and managerial obligations specified in the Shareholder Agreement six months before Mr. Nathan's term as CEO expired. The fact that the parties entered into a separate agreement providing that the company ESS would assume these obligations further indicates that the parties did not intend to personally obligate Mr. Nathan after he stepped down as CEO.

Case 1:07-cv-00977-LO-TRJ   Document 72   Filed 06/03/09   Page 10 of 10 PageID# 648

the jury to find that Mr. Nathan personally owes $47,000 to Defendants. *See* Fed. R. Civ. P. 50; *GSM Dealer Services, Inc.*, 32 F.3d at 142. The Court must enter judgment as a matter of law in favor of Mr. Nathan on this counterclaim. *Id.*

## IV.   Conclusion.

Accordingly, the Court will DENY Defendants' Motion to Set Aside Jury Verdict and for Entry of Judgment In Favor of Defendants, and GRANT Plaintiffs' Cross-Motion To Set Aside Jury Verdict and for Entry of Judgment In Favor of Plaintiffs. An appropriate order shall be entered forthwith.

June 3, 2009
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge